JOHN D. DIETRICH, ET UX. *v.* GARNET WM. ANDERSON, JR.

[No. 54, January Term, 1945.]

*Decided June 28, 1945.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, MELVIN, HENDERSON, and MARKELL, JJ.

*Edward L. Ward,* with whom were *H. Courtney Jenifer* and *Walter M. Jenifer* on the brief, for the appellants.

*Herbert M. Brune* and *H. Hamilton Hackney,* with whom was *Louis M. Riehl* on the brief, for the appellee.

*Hall Hammond* and *Roy W. Smith* on the brief *amici curiae* for the mother of Sandra Anne Anderson, etc.

MELVIN, J., delivered the opinion of the Court.

This case involves the custody of a child, Sandra Anne Anderson, whose parents were but seventeen years old when she was born (August 19, 1939), and were married while high school pupils in Council Bluffs, Iowa. Being totally unprepared for the duties and obligations of parenthood, the young father (the appellee here), who chose not to be diverted from his career as a student but continued on in that role from high school to college, soon found himself without wife or child. They separated in May, 1940, at Kingsport, Tennessee, the mother and infant leaving, without the father's knowledge, for Towson, Maryland, and the father, a few days later, going back to Nebraska. The purpose of the mother's visit to Towson, as subsequently revealed, was to join her sister and their mother who, with the sister's husband, were then living in an apartment in the home of Mr. and Mrs. John D. Dietrich, the appellants in the instant case.

It was during this visit that the latter were asked, so they testified, to take over the care and custody of the infant, Sandra, with a view to adopting her. The mother did not appear as a witness, nor did her sister and brother-in-law, who must have been thoroughly conversant with Sandra's status in this home, so that on the record before us it is uncontradicted that she was placed with the Dietrichs under the circumstances related by them.

When the child's mother and grandmother returned to their home in Council Bluffs, Iowa, in July, 1940, they left Sandra, then ten months old, with the Dietrichs and she has been there ever since. She has had no other home

and has known no parents other than Mr. and Mrs. Dietrich, who had no children of their own. It is undisputed—in fact, it is conceded and emphasized throughout the successive stages of these proceedings—that this home, located in a delightful suburban environment, has left nothing to be desired in the way of wholesome, material advantages, and that in it this infant has developed into a happy, healthy child under the loving care and devotion of these foster parents who are, themselves, respected and substantial citizens of high moral character.

Under date of March 14, 1941, Mr. and Mrs. Dietrich filed a petition in the Circuit Court for Baltimore County under Section 85 of Article 16 of the Code, 1939, asking the court to assume jurisdiction of the infant, Sandra Anne Anderson, and to award them temporary custody of her. This petition was based on the allegations, mainly, that the infant's mother and maternal grandmother requested the petitioners, in May, 1940, to care for and adopt her; that having no children of their own, and being desirous of having a child in the home, they agreed to this upon the mother's promise that immediately upon her return to Council Bluffs she would institute divorce proceedings against her husband, obtain custody of the child, and then consent to the adoption proceedings in Baltimore County; that "the father of the infant is in the military service and apparently has no interest in the child" (it was later disclosed that he was then a student at the University of Tennessee); that the mother has no means of support and no home of her own; that within a few days prior to the filing of the petition two letters had been received from the mother, threatening to come to Baltimore and take the child; that from their knowledge of the parents, petitioners believe it would be unfair to the infant to permit it to be taken from them by the mother, and that "the safety, welfare and best interests of the child demand that this court assume jurisdiction over it at this time, to the end that a full investigation

might be made by this court and its permanent custody later determined."

On this petition the court passed an order assuming jurisdiction and control of the infant, and awarding temporary custody to the petitioners "with leave to the parents, or either of them, to move for a recission of this order at any time."

Under date of March 20, 1941, the infant's mother, Geraldine Anne Anderson, filed a demurrer and answer to this petition, asking that the child's custody be awarded to her, instead of to the petitioners. The matter of this petition and answer was set for hearing in open court, and for four days during the first week in June, 1941, the hearings were conducted before the Chancellor (the late Judge William H. Lawrence). All parties in interest, including the parents of the infant, appeared in person and were represented by counsel.

As a result of these hearings, the court on June 10, 1941, entered a decree awarding the custody of the infant, Sandra Anne Anderson, to the petitioners, John D. Dietrich and Mae Marsh Dietrich, his wife, and assuming jurisdiction over said infant, subject to the further order of the court. No appeal was taken from this decree, and its provisions, including, specifically, the assuming of jurisdiction, were not questioned on the record until June 13, 1944, when the father of the infant, Garnet W. Anderson, Jr., filed a petition in the original proceedings, asking that this court vacate its aforesaid order of June 10, 1941, on the ground that it was without jurisdiction to pass it, and alleging that the State of Virginia, and not the State of Maryland, was, and is, the legal domicile of the infant. The petition further alleges that the material and financial circumstances of the petitioner are now such that he is able to provide a suitable home and proper environment for his infant daughter, so that she can live with him and his mother in Memphis, Tennessee, in quarters which he will provide for them. He contends that "under the present circumstances, peti-

tioner, as parent and natural guardian of the infant, Sandra Anne Anderson, is entitled to be awarded the custody of his daughter." It is shown by the petition, and not disputed in the case, that since October, 1941, the petitioner has been in active service in the Army Air Corps; that for seventeen months until January, 1944, he was in foreign service as an air pilot; that he has made a meritorious and distinguished record in that service, and has been promoted to the rank of captain. Since September 25, 1944, he has been on duty at Memphis, Tennessee, where he expects to be stationed "for an extended period" at the Memphis Air Base.

To this petition Mr. and Mrs. Dietrich filed a demurrer averring, in substance, that the petitioner assigns no material change of circumstances arising after the decree of June 10, 1941, legally justifying a modification of the decree for change of custody of the infant, Sandra Anne Anderson, and that "the question of jurisdiction of this court to pass this decree of June 10, 1941, as well as the legal domicile of the child, Sandra Anne Anderson, is *res adjudicata.*" The court (Judge Murray) on November 28, 1944, sustained the demurrer on "the question of the jurisdiction of this court to hear and determine this cause and to assume jurisdiction over said infant." The demurrer as to all other grounds was overruled and the respondents granted leave to answer the remaining averments. This they did at length by referring in detail to the proceedings in June, 1941, leading up to the passage of the decree of June 10, 1941, and relating the progress made by the infant Sandra while in their home, without any help or contribution of any kind from, or interest shown by, the father or mother, since she was left with the respondents in 1940.

On this petition and answer the court of equity again heard voluminous testimony on the conflicting claims to this infant's custody. Whereas, in June, 1941, the principal contestant against the Dietrichs was the young mother on the allegation that the father apparently had

no interest in the child, at the hearing in June, 1944, it was the father who, for the first time, assumed the role of active claimant against the Dietrichs, and did so on the allegation, among others, that "she (the mother) has abandoned all claim to the care and custody of the infant, Sandra Anne Anderson."

At this last hearing, the chancellor pointed out that the "material and vital testimony" to be adduced before him "would be that which would affect the standing of the parties since the decree of Judge Lawrence," to which observation senior counsel for the petitioner responded, according to the record, "We are in entire agreement with Your Honor's ruling."

We concur in this limitation of the scope of the testimony and will confine our review of it to the single point of ascertaining whether or not there has been such a substantial change of circumstances affecting, or likely to affect, the welfare of the infant child, as would justify the court in annulling, varying or modifying its original decree. The chancellor came to the conclusion, after the hearing before him in December, 1944, that the testimony did show such a change of circumstances and accordingly, under date of January 8, 1945, entered a decree setting aside the decree of June 10, 1941, and awarding the custody of the infant child, Sandra Anne Anderson, to the petitioner, Garnet W. Anderson, Jr., her father. It is from this decree that Mr. and Mrs. Dietrich have appealed, the order for appeal being filed on January 11, 1945. By leave of court, the child's mother, who was divorced from the appellee in Iowa on June 30, 1941, and has since remarried, intervened on this appeal as "amicus curiae." She has taken the position that it would be contrary to the child's best interests to have her custody awarded to the appellee, urging that it be continued with the appellants until such time in the indefinite future as she (the mother) may be able to provide a home for her.

On February 28, 1945, the appellants presented to the court a petition for review of the decree of January 8, 1945, together with numerous affidavits which were offered in support of certain alleged newly discovered evidence reflecting on the character of the appellee and his parents. The court that same day passed an order denying leave to file said petition; whereupon the petitioners entered their appeal from this second order, while the first one was still pending. The appellee, in due course, filed a motion to dismiss this appeal from the order of February 28, 1945, and also a motion to dismiss the appeal from the order filed January 8, 1945.

We find no difficulty in disposing of the motion first mentioned, for the mere statement of the ground of it shows the non-appealability of the court's order. This ground is: "An appeal from the order of January 8 having been entered on January 11, 1945, and being still pending, the Circuit Court was without power to entertain the said petition for a review on February 28, 1945, * * *." This point is well taken, for the authority cited in the motion, *Eastern States Corporation v. Eisler*, 181 Md. 526, 30 A. 2d 867, 871, is conclusive of it. As there held, all jurisdiction of the chancellor ceases upon the filing of an appeal from a final order in a case pending before him, and he has no jurisdiction to pass any further order in the case, with certain exceptions not here material. See also *Collier v. Collier*, 182 Md. 82, 32 A. 2d 469. If, as contended by the appellants, this newly discovered evidence called for a review of the former decree, they would still have the opportunity of presenting their petition, even in the event the order first appealed from should be affirmed. As pointed out by this Court in *Safe Deposit & Trust Co. v. Gittings*, 102 Md. 456, 464, 62 A. 1030, 1033, 4 L. R. A., N. S., 865, 5 Ann. Cas. 941, citing *Pinkney, Administrator v. Jay et al.*, 12 Gill & J. 69, "a bill of review for newly discovered evidence will lie in the lower court after affirmance on appeal, and we know of no principle which would discrimi-

nate in this regard between an affirmance and a reversal of the decree of the lower court." However, as construed by the Court in the Eisler and Collier cases, *supra,* the limitation upon this power of the court of chancery is that, pending an appeal from a former decree, it has no jurisdiction to take further action in the case. The appellee's motion to dismiss the appeal from the order of February 28, 1945, is therefore granted.

This ruling excludes from the Court's consideration of the merits of the case the exhibits filed with the petition. In passing upon this appeal we assume, of course, that the persons mentioned in the exhibits are innocent of the accusations therein made against them.

The other motion filed by the appellee, namely, to dismiss the appeal from the order of January 8, 1945, is likewise free from difficulty but it calls for a different ruling. The grounds of the motion are, in substance, that Mr. and Mrs. Dietrich are not within the class of persons permitted by the statute (Art. 5, Sec. 31) to appeal from an order of court in a child custody matter; that an order awarding custody under the provisions of Article 16, Section 85, of the Code, being subject to the further order of the court, is not a final order within the meaning of the statutes relating to appeals in equity; that the appellants, not being related in any way to the infant in question, have no personal or pecuniary right in her custody sufficient to support an appeal; that no person, other than a "parent, grand-parent or natural guardian, has ever been permitted by this court to appeal from an order depriving him of the custody of an infant."

The complete answer to this motion is that the appeal in this case is fully authorized by Sec. 30 of Art. 5 of the Code, 1939, which provides that "An appeal shall be allowed from any final decree, or order in the nature of a final decree, passed by a court of equity by any one or more of the persons parties to the suit,* * *." Nothing could be plainer than the qualification of Mr. and Mrs.

Dietrich as "persons parties to the suit," or that the chancellor's order of January 8, 1945, is a final decree, or "order in the nature of a final decree."

While it is true that the jurisdiction of a court of equity in child custody cases is a continuing, supervisory one, an order awarding custody may be "final" as to the facts before the court, although not permanent. *Pangle v. Pangle*, 134 Md. 166, 106 A. 337. Furthermore, when the court passes an order, as it did in the instant case, completely terminating its jurisdiction over an infant and awarding the custody to one who avowedly will immediately take the child out of the State of Maryland, it is too clear for comment that this is a final order within the meaning of the statute.

The appellee has earnestly challenged the jurisdiction of the court to pass its decree of June 10, 1941, by which the custody of the child in question was awarded to Mr. and Mrs. Dietrich. That is the first ground of his petition in the pending proceeding. While the court is indebted to counsel for a very thorough and able brief on this subject, we are unable to find any merit in the point. It is not a question on this appeal of interstate jurisdiction in child custody cases. It is, rather, one of deciding whether the decree of a court of equity in Maryland, awarding custody of a child then before it in an appropriate statutory proceeding, should be set aside by this same court several years later on the petition of a party in interest who had appeared in person and by counsel at the original hearing, and who did not appeal from the court's decree.

The authorities cited on behalf of the appellee are beside this point, for there is here no question of conflict of laws. The definition of jurisdiction in the *Re-statement*, par. 42, is: "As used in the Re-statement of this subject, jurisdiction means the power of the State to create interests which will be recognized as valid in other States." In this sense the instant case presents no question of jurisdiction at all. Such questions might possibly

arise hereafter, if and when (1) the appellants should take the child into another State and attempt to maintain custody there; or (2) the Maryland court should attempt to compel the father or mother to pay for maintenance of the child; or (3) some court of some other State should attempt to interfere with the custody of the child in Maryland. There is no such question before us here, and we find no reason or authority on any aspect of this subject for disturbing the ruling of the court below on the point now under consideration. See *The Queen v. Gwngall,* 2 Q. B. 232; *Finlay v. Finlay,* 240 N. Y. 429, 431, 148 N. E. 624, (Cardozo, J.) ; *Matter of Hubbard,* 82 N. Y. 90, 93, 95; *Pomeroy, Eq. Jur.,* 5th Ed., Secs. 1305, 1306, 1307; *Bliss v. Bliss,* 133 Md. 61, 104 A. 467; *White v. White,* 77 N. H. 26, 30, 31, 86 A. 353.

We come, finally, to the substantial and controlling question presented by the appellee's petition, namely, "(3) That under the present circumstances, petitioner as parent and guardian of the infant, Sandra Anne Anderson, is entitled to be awarded the custody of his said daughter." It is conceded by the appellee that at the time the court awarded the custody of his infant daughter to the Dietrichs (June 10, 1941) he was in no position to provide for her himself, or to perform any of his parental obligations. He alleges in his petition that "it would have been necessary for him, had the custody of the child been awarded to him, to place her in the care of his mother, Mrs. Garnet W. Anderson, Sr., until he was in a position to provide a home for the child where he, himself, would reside." What his mother's circumstances were at the time, or whether she was available or eligible as the custodian of this infant, is not indicated, but the fact is that the young father was apparently quite content to have the Dietrichs continue to relieve him of all his parental duties and obligations, as they had been doing since May, 1940.

His next appearance in the life of his child was in June, 1944, when, out of a clear sky so far as the Dietrichs

were concerned, he filed the petition hereinbefore mentioned, which concludes with the claim that, "being in all respects a suitable person, morally and financially, to have the care and custody of his daughter, and being able to provide a proper home for her, together with his mother and himself, he is entitled to, and ought to have, the custody of the said child awarded to him."

The "present circumstances" which he cites to support this claim are, principally, that he is now a captain in the United States Army, with a base pay of $336 per month; that he has rented for himself, his daughter and his mother a three-room apartment in a desirable residential section of Memphis, Tennessee, where he expects to be stationed for an extended period at the Memphis Air Base; that he has obtained the consent of his mother to live with them and take care of the child "during the hours when he is required to be at the air base in the performance of his duties." This allegation of the petition is supplemented in his testimony by the statement that his duties with the "4th Ferrying Group" require his absence from home for periods of about ten days, and allow him approximately that same period of free time when not on this active duty. He further testified that he has well-formed plans for his daughter's education and upbringing, and has made ample financial arrangements for her present and future welfare.

Inasmuch as the appellee bases his whole claim to the custody of his child on his mother's alleged willingness and availability to serve as her actual custodian *in loco parentis*, it is important and necessary, of course, to carefully consider this phase of the petition. What has she to offer to the court on Sandra's behalf as a substitute for the stability and parental care of the Dietrich home, in which the child has been raised from infancy, and where there is reciprocal love and affection?

Mrs. Anderson, Sr., has been married since 1921, and her husband is now, and has been for many years, a superintendent of construction whose work has required

him to move about from place to place. During the past few years, so she testified, he has lived in at least five States, and during one season, 1941, was in Alaska. They have lived in hotels and apartments and have no permanent residence, or even any furniture or household effects. At present, Mr. Anderson, Sr., is located in Illinois. She further testified that, if the custody of the child should be awarded to her son, she would go to Memphis to live with them and exchange visits with her husband from time to time, perhaps taking the child with her during vacations from school. What would become of the child if her father, the appellee, had to leave Memphis in the line of his duty as an army officer, and just who would stand *in loco parentis* in that contingency, or how she would be provided for in the way of a home and parental care, are not shown in the record.

Set off against this picture of instability and uncertainty as to Sandra's immediate future is the picture of her in her present environment and actual living conditions, under the protection of foster parents who have proved their fitness to be entrusted with her care, and also under the protection of a court familiar with the whole case and solicitous always of her well-being. The course which the court should take in deciding this case is clearly indicated by this comparison. It is to retain jurisdiction of the infant child, Sandra, and to continue her custody with the appellants, subject to the further order of the chancellor.

In this class of cases the welfare of the child is the consideration of transcendent importance, and this holds true even when it means denial of the custody to the parents, or either of them. While a father is generally entitled to the custody of his infant child, this right is derived from his duty to support and maintain it, and may be forfeited or suspended by his failure to do so. He has no rights as a parent which are not subordinate to those of the sovereign state, as prescribed by statute in Maryland. One of these statutes is particularly ap-

plicable here. It is Section 85 of Article 16 of the Code, 1939, as follows: "85. The several equity courts of this State shall have original jurisdiction in all cases, relating to the custody or guardianship of children, and may, on bill or petition filed by the father or mother or relative or next of kin or next friend of any child or children to direct who shall have the custody or guardianship of such child or children, and who shall be charged with his, her or their support and maintenance, and may from time to time thereafter annul, vary or modify its decree or order relating to such child or children * * *."

Still another relevant statute is Section 1 of Article 72A of the Code, which, after stating that the father and mother are the joint natural guardians of their minor child and are equally chargeable with its care, nurture and education, contains this significant provision: "The provisions of this Article shall not be deemed to affect the existing law relative to the appointment of a third person as guardian of the person of the minor where the parents are unsuitable, or the child's interests would be adversely affected by remaining under the natural guardianship of its parent or parents."

As uniformly construed, Article 16, Section 85, *supra;* requires that the power thereby conferred should be exercised with the paramount purpose of securing the welfare and promoting the best interests of the children. *Barnard v. Godfrey,* 157 Md. 264, 265, 145 A. 614; *Carter v. Carter,* 156 Md. 500, 505, 144 A. 490; *Maddox v. Maddox,* 174 Md. 470, 199 A. 507; *Alston v. Thomas,* 161 Md. 617, 158 A. 24; *Piotrowski v. State,* 179 Md. 377, 18 A. 2d 199; *Schneider v. Hasson,* 161 Md. 547, 157 A. 739.

This construction not only applies in cases of dispute between parents as to the custody of their children, but applies to all cases where those interests are in jeopardy. This policy of the law could hardly be expressed with more clarity or emphasis than in the case cited in *Kartman v. Kartman,* 163 Md. 19, 22, 161 A. 269, namely, *Re Petition of Frank B. Bort,* 25 Kan. 308, 37 Am. Rep. 255: "When

the custody of children is the question * * * the best interest of the children is the paramount fact. Rights of father and mother sink into insignificance before that. Even when father and mother are living together, a court has the power, if the best interests of the child require it, to take it away from both parents and commit the custody to a third person. In other words, a court of chancery stands as a guardian of all children and may interfere at any time and in any way to protect and advance their welfare and interests."

Another case which is even more striking in its similarity, on both the issues and the law, to the case at bar, is *Chapsky v. Wood*, 26 Kan. 650, 40 Am. Rep. 321, in which the opinion was likewise written by Justice Brewer, later of the Supreme Court of the United States. There a father was seeking to regain possession of his infant daughter from his wife's sister, with whom the child had been left in early infancy. For five and a half years this sister-in-law gave the child loving care and attention and a strong affection between them was developed. In denying the father's claim to custody, Justice Brewer summed up the law in these words: "The father is the natural guardian and is *prima facie* entitled to the custody of his minor child. This right springs from two sources: one is, that he who brings a child, a helpless being into life, ought to take care of that child until it is able to take care of itself; and because of this obligation to take care of and support this helpless being arises a reciprocal right to the custody and care of the offspring whom he must support; and the other reason is, that it is a law of nature that the affection which springs from such a relation as that is stronger and more potent than any which springs from any other human relation. * * * ."

The learned judge then makes the following comments as to the applicable principles of law, which have a very direct bearing on the issue before us in the instant case: "* * * yet, when * * * the child has been left for years in the care and custody of others, who have discharged

all the obligations of support and care which naturally rest upon the parent, then, whether the courts will enforce the father's right to the custody of the child, will depend mainly upon the question whether such custody will promote the welfare and interest of such child. This, distinction must be recognized. If, immediately after the gift, reclamation be sought, and the father is not what may be called an unfit person by reason of immorality, etc., the courts will pay little attention to any mere speculation as to the probability of benefit to the child by leaving or returning it. In other words, they will consider that the law of nature, which declares the strength of a father's love, is more to be considered than any mere speculation whatever as to the advantages which possible wealth and social position might otherwise bestow. But, on the other hand, when reclamation is not sought until a lapse of years, when new ties have been formed and a certain current given to the child's life and thought, much attention should be paid to the probabilities of a benefit to the child from the change. It is an obvious fact, that ties of blood weaken, and ties of companionship strengthen, by lapse of time; and the prosperity and welfare of the child depend on the number and strength of these ties, as well as on the ability to do all which the promptings of these ties compel.

"* * * In questions of this kind three interests should be considered: The right of the father must be considered; the right of the one who has filled the parental place for years should be considered. Perhaps it may not be technically correct to speak of that as a right; and yet, they who have for years filled the place of the parent, have discharged all the obligations of care and support, and especially when they have discharged these duties during those years of infancy when the burden is especially heavy, when the labor and care are of a kind whose value cannot be expressed in money—when all these labors have been performed and the child has bloomed into a bright and happy girlhood, it is but fair and proper that

their previous faithfulness, and the interest and affection which these labors have created in them, should be respected. Above all things, the paramount consideration is, what will promote the welfare of the child? These, I think, are about all the rules of law applicable to a case of this kind."

The legal principles which govern the case at bar are identical with those so aptly expressed by the eminent judge above quoted, and require no further comment to support their authority here.

We conclude that the appellee in the instant case has failed to show such a material change of circumstances since the decree of June 10, 1941, as would justify the court, in the infant's behalf and regarding her own best interests as the paramount concern of the law, in annulling, varying or modifying the said decree. See *Piotrowski v. State,* 179 Md. at page 383, 18 A. 2d at page 201, *supra.*

The case before us sums up to this: When a boy and a girl, barely out of their childhood, suddenly acquire the status of husband and wife, and within a year thereafter the added status of parent and child with all the duties, burdens and responsibilities incident thereto, and to cope with which they are in no respect prepared, it was a natural, if not inevitable, consequence that, sooner or later, they would need the aid of a court of equity to dissolve the former status and to protect the latter. It is in just such a situation as this that the State comes to the rescue of the innocent victims of these unfortunate misalliances—the children—by vesting in the equity courts wide discretion and power to award custody of them where it would be most conducive to their welfare, exclusively. If the exercise of this broad power should require, in the court's discretion, the separation, either temporarily or permanently, of parent and child, it will not hesitate to give effect to this paramount purpose of the law.

We hold that that is precisely what happened in the case at bar when the chancellor, by his decree of June 10, 1941, placed this infant in the custody of the appellants and, as stated, we find from the record before us no circumstances which would justify a modification of that decree. The chancellor by his decree of January 8, 1945, having held to the contrary, we must reverse that ruling.

> *Motion to dismiss appeal from the order of February 28, 1945, granted and appeal dismissed, with costs to the appellee.*

> *Motion to dismiss appeal from decree of January 8, 1945, overruled and said decree reversed, with costs to the appellants.*