ABDUL-RAHMAN OMAR ADRA

v.

Virgil A. CLIFT and Nesrine Clift, his wife.

Civ. No. 12478.

United States District Court
D. Maryland.

June 30, 1961.

------

Warren W. Grimes, Washington, D. C., for plaintiff.

Charles J. Josey, Baltimore, Md., for defendants.

THOMSEN, Chief Judge.

This is an action under 28 U.S.C.A. § 1350, which provides:

"*Alien's action for tort*

"The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."

Plaintiff, Abdul-Rahman Omar Adra, is an alien, a native citizen and national of the Republic of Lebanon, presently resident as its Ambassador to Iran at Teheran, Iran. He is and was born an Arab, a Sunnite Moslem.

Defendant, Nesrine Adeeb (Adibe) Clift, the divorced wife of plaintiff and the present wife of co-defendant Virgil A. Clift, is an alien, born in Istanbul, Turkey, during the 1920 Revolution, now a national of Iraq, presently residing at Baltimore, Maryland. She is and was born an Arab, a Sunnite Moslem.

Najwa Adra, the only child of plaintiff and defendant, was born at Beirut, Lebanon, on March 23, 1946. She has at all times been a national of Lebanon.

Co-defendant, Virgil A. Clift, is an American citizen, residing in Baltimore, Maryland.

Plaintiff contends that under Moslem and Lebanese law, confirmed by the decree of a Lebanese court, he became entitled to the custody of his daughter Najwa when she became nine years of age; that defendants have refused to deliver Najwa to his custody, as required; and that since plaintiff became entitled to such custody defendant has taken Najwa from country to country under an Iraqi passport, concealing the child's name and nationality, in violation of the law of nations and of plaintiff's rights as the child's father. He seeks not damages, but a judgment or decree requiring defendants to deliver Najwa to his custody.

Defendants have filed a counterclaim for money alleged to have been spent for the maintenance and support of Najwa.

The questions presented include:

I. Does this Court have jurisdiction to hear and determine this case? (A) Is this a civil action for a tort only? (1) Has any tort been alleged or proved? (2) Does the relief prayed take the case out of the category of a tort action? (B) Was the tort committed in violation of the law of nations or a treaty of the United States? (C) Should jurisdiction be declined because the case involves domestic relations?

II. Should plaintiff be granted the relief prayed?

III. (A) Does this Court have jurisdiction over the counterclaim? If so, (B) are defendants entitled to any recovery thereunder?

The case was tried before the Court without a jury in December 1960. Testimony was taken and many exhibits were filed. Decision was delayed, so that additional information could be obtained and briefs submitted. Counsel for plaintiff submitted a full and able brief, as did counsel for defendants. Counsel for plaintiff died before he could reply to defendants' brief, but plaintiff himself has submitted a detailed and skillful reply, which I have read and considered.

## Facts

Plaintiff and defendant were married, with Sunnite rites, at Tripoli, Lebanon, on April 9, 1945. Najwa was born at Beirut, Lebanon, on March 23, 1946. On March 27, 1948, plaintiff divorced defendant "according to her desire" because of "psychological incompatibility". The divorce was confirmed on April 27, 1948, by the Religious Court of Beirut, which has jurisdiction under Lebanese law of cases involving domestic relations between Moslems. Mohammedan law governs the domestic relations of Moslems in Lebanon, except as that law may have been modified by statute. Other laws, enforced by other courts, govern the domestic relations of persons who are not Moslems. The controlling statute governing the right to custody is Art. 391, Lebanese Code of Personal Status, which is based on the generally accepted Mohammedan Law.[1] Art. 391 provides:

"The period of infant custody (boy's custody) ends and shall not require care by a woman when he attains the following conditions:—

"—when he becomes seven years old.

"As to the girl's custody as above, the period of custody and care by a woman ends when she attains nine years of age.

"The father has then the right to take them out of such custody. And should he not ask for them he shall be compelled to take them by law.

"And should the period of such custody and the child has no father or grandfather, then he shall be placed into the care and handed over to the nearest kin in blood or to the guardian administrator, in case of the boy; and the girls shall not be handed over and placed under the care of any illegal person.

"Should the person to take care and administer care to the boy be not of the same blood or a guardian, the said boy shall be left with the woman-custodian who was first nursing him until such time that the Kadi (religious judge) shall consider another woman-custodian who would have more priority."

After the divorce, defendant took Najwa to defendant's family home in Iraq, under a Lebanese passport, valid for one year. Plaintiff did not object to defendant taking Najwa to Iraq. He sent money for her support until defendant took Najwa to Paris without his consent. Some efforts were made looking toward a reconciliation, including visits by both plaintiff and defendant to psychiatrists. Although all of the parties to the case are intelligent, highly educated people, both plaintiff and defendant are obviously high strung. Plaintiff has B.A. and M.A. degrees and was an instructor at the American University of Beirut before entering the diplomatic service. Defendant is a graduate of the American University of Beirut, and holds a M.A. degree from the University of Michigan. She is skilled as a teacher of science and as an instructor of prospective science teachers. In 1949 she was employed by UNESCO in Paris, and took Najwa to France with her. Despite her

1. See Fyzee, Outlines of Muhammadan Law, 2d ed., p. 172. Other features of Moslem law, testified to or not disputed by the experts for the parties, are as follows: "Should the father fail to ask or take the child after Hidanah, or be unable to do so, custody rights go first to his male relatives in various degrees, next to anyone else designated by the Court; and, failing any of these and only then, the mother may be awarded custody."

"If, during her custody period, the mother without permission of the father, takes or keeps the child at a distance where it is impossible for the father to visit the child and return to his home in one day and by usual travel means, the mother's custody rights are terminated or forfeited." Fyzee, op. cit. p. 173.

"If a divorced mother marries a stranger or anyone outside the permitted family degrees, she loses her rights to custody of the child." Vessey-Fitzgerald "Muhammadan Law", p. 100.

"While a father is required to maintain a daughter until married, an unmarried daughter is not entitled to separate maintenance unless the circumstances are such as to justify her in staying away from him." Fyzee, op. cit. p. 183.

testimony that plaintiff knew in advance of her intention to do so, I find that he did not, and he promptly brought suit in the Religious Court of Beirut to secure the custody of Najwa. He won the case in the nisi prius court, but defendant appealed and the appellate court reversed the decision. The action of the appellate court was finally confirmed by the Supreme Court in 1953 or 1955.[2]

Meanwhile, defendant returned to Iraq, where she was employed in a teachers' college. She brought suit in an Iraqi court against plaintiff for the support of Najwa and was awarded 27 dinars ($8.-13) a month. Plaintiff was not in Iraq and did not appear, but took an appeal, which was dismissed because filed too late. The two suits decide that defendant had done nothing to forfeit the custody of Najwa until the child became nine years of age, which occurred on March 23, 1955; they decide nothing about the rights of either party thereafter.

Although defendant had resumed her Iraqi nationality, it is quite clear that under the law of nations, as well as the laws of the United States, Lebanon and Iraq, Najwa remained at all times a national of Lebanon, and could travel legally from country to country only on a Lebanese passport.

In 1954 defendant had caused Najwa to be included in defendant's Iraqi passport, concealing the child's full name and nationality. This was contrary to the law of Iraq, as well as the law of nations. In 1956, 1957 and 1958 defendant took Najwa on visits to Europe and to various countries in Asia and Africa, including Libya, where defendant was then employed. In Libya defendant met Dr. Clift, the co-defendant, who had been Professor of Education and Head of the Department of Education at Morgan State College in Baltimore, Maryland, since 1948, and who had been recruited by the International Cooperation Administration of the Department of State of the United States to serve as Educational Adviser to Libya during the years 1956 to 1958. Defendant and co-defendant became friends, professionally and socially, and considered marriage while they were still in Libya. They decided, however, that it would be unwise to be married until defendant had visited Baltimore and judged for herself the situation in which she and Najwa would live.

Defendant thereupon applied for a visa to the American Embassy at Tripoli, again failing to disclose Najwa's nationality, and making an affidavit with respect to Najwa's name which was misleading if not deliberately false. Defendant stated that her intention in coming to the United States was to attend a one semester course at the University of Maryland, and gave College Park as her intended address. She and Najwa entered the United States on June 23, 1958. Najwa was admitted as an Iraqi national. They came at once to Baltimore, where defendant attended a conference on teaching science which was held at Morgan State College in the summer of 1958. Dr. Clift joined her there about July 23, found she was willing to marry him, applied for a marriage license in the District of Columbia on July 28, 1958, in which he swore that both he and defendant were "colored",[3] and they were married on August 4, 1958, in Washington.

Dr. Clift has resumed his position at Morgan State College. Defendant has lectured there and at Goucher College and has taught in the Baltimore public schools.

Najwa has entered the Woodbourne Junior High School, a desegregated public school in Baltimore, where she has

---

2. As translated, the opinions are difficult to understand.

3. Evidently to prevent possible legal difficulties under Maryland laws, valid or invalid. See Md.Code, 1957 ed., Art. 23, sec. 3, and State v. Howard, Criminal Court of Baltimore City, Niles, C.J., Daily Record, April 27, 1957. Cf. Loughran v. Loughran, 292 U.S. 216, 54 S.Ct. 684, 78 L.Ed. 1219; Williams v. State of North Carolina, 325 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577; Metropolitan Life Ins. Co. v. Chase, D.N.J., 189 F.Supp. 326.

done very good work, has made some social contacts, and has attended a number of inter-racial parties. She has visited the Mohammedan Center in Washington, and attends with some regularity meetings at the Homewood Friends Meeting House, opposite the campus of the Johns Hopkins University. She hopes to go to college and on to graduate work in science.

After Najwa became nine years of age in 1955 plaintiff made repeated efforts, through negotiations between members of the respective families, to secure Najwa's return to his custody, and to have her visit him and his family. He has married a Christian Arab, and they have one daughter, Najwa's half-sister. However, plaintiff did not file any suit to secure such custody until 1959, after defendant and Najwa had left the Near East for permanent residence in the United States.

On December 12, 1959, plaintiff obtained a judgment in the Religious Court of Beirut against defendant for the return of Najwa to his custody. Defendant was served by publication in two newspapers and by posting on the bulletin board of the Court. Plaintiff testified that he did not know where defendant was and had been unable to locate her between 1955 and 1960. I find that plaintiff did not know exactly where she was, and that she had made some efforts to avoid his being notified of her moves from country to country and particularly of her address in the United States.[4]

Dr. Eisenberg, Director of the Children's Psychiatric Service and Associate Professor of Psychiatry in Pediatrics at the Johns Hopkins Hospital and Medical School, examined Najwa with her mother present and testified that although he recognizes that Najwa will face many problems in her present home and environment, he felt that in view of her age, sex and previous relationship with her parents, the child's welfare would

"unquestionably be served" by having her remain in her mother's home.

In a private conference, with only a female court reporter present, Najwa told me that she desires to remain with her mother. It is quite clear that her attitude toward her father has been shaped and distorted by defendant.

In May 1959 defendant obtained a new Iraqi passport in Washington, issued to her as Nesrine Adibe, which included Najwa under her first name only. In August 1960 the Iraqi Embassy notified defendant that Najwa's name would have to be "taken off" the passport because Najwa is a Lebanese national. Meanwhile defendant had had her status and that of Najwa adjusted for permanent residence in the United States, Najwa's name being given as Najwa A. Adib, and her nationality as Iraqi.

## I.

### Jurisdiction

#### A.

Is This a Civil Action for a Tort Only?

*(1) Has any Tort Been Alleged or Proved?*

■■ The unlawful taking or withholding of a minor child from the custody of the parent or parents entitled to such custody is a tort. A parent not entitled to custody has no privilege to interfere with the legal custody of the child. Prosser on Torts, 2d ed., sec. 103, pp. 692–693; Restatement, Torts, sec. 700.

Comment c to sec. 700 suggests that one parent's liability to the other for abduction may depend upon whether, by judicial decree, the sole custody of the child has been awarded to one parent. This comment, no doubt, springs from the fact that in the United States both parents are usually equally entitled to the custody of the child. In the instant case, however, both plaintiff and the child are

---

4. Plaintiff knew or could have learned where she was before she left for the United States, while she was working for UNESCO, although she traveled extensively during 1956–58.

Lebanese nationals, and defendant was a Lebanese national from the time of her marriage to plaintiff until she resumed her Iraqi nationality. All three are Sunnite Moslems, and the controlling Lebanese statute is based on the Mohammedan law. Art. 391, Lebanese Code of Personal Status, quoted above. Under Lebanese law, plaintiff is undoubtedly entitled to the custody of his daughter. Najwa was twelve years of age when defendant brought her to the United States and is now fifteen years of age.

If a judicial decree awarding custody to one parent is required, despite the Lebanese statute, it exists in the decree of the Religious Court of Beirut dated December 12, 1959.

■ The action of the defendant in refusing to deliver Najwa to the custody of the plaintiff after Najwa become nine years of age, in taking Najwa from country to country, far from her father, under an Iraqi passport, by concealing Najwa's name and nationality, and the action of the defendant and the co-defendant in withholding Najwa from the custody of the plaintiff amount to a tort against him.

*(2) Does the Relief Prayed Take the Case out of the Category of a Tort Action?*

■ Plaintiff does not seek money damages; he seeks a judgment or decree for the return of his daughter to his custody. The award of monetary damages is the customary remedy for most torts, but other forms of relief for torts are not unheard of; e. g. in replevin cases. Prosser on Torts, 2d ed., sec. 103, p. 690, discussing "Interference with Family Relations", says: "One important development in this field is that of equitable relief to prevent interference with the relation of husband and wife. A Texas court led the way by upholding an injunction against association with the plaintiff's wife and other conduct tending to alienate her affections; and

similar injunctions have been sustained in a few other cases. The administrative difficulties standing in the way of enforcement of such injunctions have been enough to deter some of the more conservative courts from granting the relief. While little information is available as to the success of such procedure in operation, the difficulties appear to be inadequate as a reason for denying to family relations the protection given by equity to other recognized interests." Prosser cites, inter alia, Moreland, Injunctive Control of Family Relations, 1930, 18 Ky.L.J. 207; Pound, Equitable Relief Against Defamation and Injuries to Personality, 1916, 29 Harv.L.Rev. 640, 674; Long, Equitable Jurisdiction to Protect Personal Rights, 1923, 33 Yale L. J. 115, 126. Professor Chafee, in an article entitled "Progress of the Law— Equitable Relief Against Torts", says flatly: "Equity relieves against torts when the remedy at law is inadequate. 34 Harv.L.Rev. 388. See also Chafee and Re, Equity, 4th ed., Part III, p. 864.

### B.

Was the Tort Committed in Violation of the Law of Nations or a Treaty of the United States?

The statute in question, 28 U.S.C.A. § 1350, was first enacted in 1789, 1 Stat. 77. It contains no requirement that any pecuniary claim be made. Despite its age, only six cases and one opinion of Attorney General Bonaparte, 26 Op.Atty. Gen. 250 (1907), are cited in the annotations.[5] Bolchos v. Darrell, D.S.C., 3 Fed.Cas. pages 810, 811, No. 1,607, involved neutral property, slaves, in an enemy ship captured and brought into the port of Charleston and a treaty between the United States and France. Relying on the statute in question here, Judge Bee said: "It is certain that the law of nations would adjudge neutral property, thus circumstanced, to be restored to its neutral owner; but the 14th article of the treaty with France alters that law,

---

5. The earlier cases are discussed in Khedivial Line v. Seafarers' Int'l Unin 2 Cir., 278 F.2d 49, 52.

by stipulating that the property of friends found on board the vessels of an enemy shall be forfeited. Let these negroes, or the money arising from the sale, be delivered to the libellant."

Defendants argue that international law is divided into two mutually exclusive branches, the law of nations and private international law. Hilton v. Guyot, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95, relied on by defendants, does not so hold; there is some intertwining of the branches. Hyde's International Law, 2d Rev.ed., 1945, vol. 1, sec. 11A, pp. 33–34, under the heading "The Relation of International Law to Private Individuals" says: "The commission of particular acts, regardless of the character of the actors, may be so detrimental to the welfare of the international society that its international law may either clothe a State with the privilege of punishing the offender, or impose upon it the obligation to endeavor to do so. The offender may be a private individual; and when he is subjected to the imposition of a penalty, he comes into close contact with the law of nations. Whenever he commits acts on account of which a country not his own may not unlawfully proceed to punish him even though they are consummated beyond the limits of its territory and have no connection therewith, or whenever he commits acts which the territorial sovereign of the place where they are committed is under an obligation to endeavor to prevent or penalize, he feels the direct consequence of what that law permits an offended sovereign to do, or enjoins a law-respecting sovereign to do. In both situations, it is not unscientific to declare that he is guilty of conduct which the law of nations itself brands as internationally illegal. For it is by virtue of that law that such sovereign acquires the right to punish and is also burdened with the duty to prevent or prosecute.

" * * * The injunctions of international law that may be applicable to the private individual do not necessarily disappear when he enters the territory of his own or of any other State. He learns that there are acts of which that law there itself forbids the commission by any one whomsoever. Evidence of this has long been reflected in the statutory law of the United States, which subjects to penalties one who in any manner 'offers violence to the person of a public minister, in violation of the law of nations,' and which confers upon the United States District Courts original jurisdiction of 'all suits brought by any alien for a tort only, in violation of the law of nations or of a treaty of the United States.'"

In United States v. Arjona, 120 U.S. 479, 488, 7 S.Ct. 628, 632, 30 L.Ed. 728, Chief Justice Waite declared: "It remains only to consider those questions which present the point whether, in enacting a statute to define and punish an offense against the law of nations, it is necessary, in order 'to define' the offense, that it be declared in the statute itself to be 'an offense against the law of nations.' This statute defines the offense, and if the thing made punishable is one which the United States are required by their international obligations to use due diligence to prevent, it is an offense against the law of nations. Such being the case, there is no more need of declaring in the statute that it is such an offense than there would be in any other criminal statute to declare that it was enacted to carry into execution any other particular power vested by the Constitution in the Government of the United States. Whether the offense as defined is an offense against the law of nations depends on the thing done, not on any declaration to that effect by Congress."

In the instant case, despite the fact that the child Najwa was a Lebanese national, not entitled to be admitted to the United States under an Iraqi passport, defendant concealed Najwa's name and nationality, caused her to be included in defendant's Iraqi passport, and succeeded in having her admitted to the United States thereby. These were wrongful acts not only against the United States, 8 U.S.C.A. § 1182, 18 U.S.C.A. § 1546, but against the Lebanese Republic, which

is entitled to control the issuance of passports to its nationals. See Kent v. Dulles, 357 U.S. 116, 121, 78 S.Ct. 1113, 2 L.Ed.2d 1204, where the Court quoted from Urtetiqui v. D'Arbel, 9 Pet. 692, 699, 9 L.Ed. 276, as follows: "[A passport] is a document, which, from its nature and object, is addressed to foreign powers; purporting only to be a request that the bearer of it may pass safely and freely; and is to be considered rather in the character of a political document, by which the bearer is recognized, in foreign countries, as an American citizen; and which, by usage and the law of nations, is received as evidence of the fact." See also Hackworth, Digest of International Law, vol. III. ch. X, 1942.

■ The wrongful acts were therefore committed in violation of the law of nations. And since they caused direct and special injury to the plaintiff, he may bring an action in tort therefor.

### C.

Should Jurisdiction be Declined Because the Case Involves Domestic Relations?

The federal courts have generally declined jurisdiction in cases involving domestic relations. See e. g. In re Burrus, 136 U.S. 586, 593–594, 10 S.Ct. 850, 34 L.Ed. 500; In re Barry, C.C.S.D. N.Y., 42 F. 113; Popovici v. Popovici, N.D.Ohio, 30 F.2d 185; Ohio ex rel. Popovici v. Agler, 280 U.S. 379, 383, 50 S.Ct. 154, 74 L.Ed. 489. But see Daily v. Parker, 7 Cir., 152 F.2d 174, 162 A. L.R. 819; Hastings v. Douglass, N.D. W.Va., 249 F. 378. Most of the cases in which jurisdiction was declined were either divorce cases or habeas corpus cases involving the custody of children. None involved the special grant of jurisdiction by the section under consideration, 28 U.S.C.A. § 1350, although the Popovici case is analogous in some respects.

■ These authorities raise a grave doubt whether this Court should entertain jurisdiction. State courts have un-

doubted competence and wide experience in dealing with cases involving domestic relations. On the other hand, this case involves, among other questions, those of nationality and entry into the United States, with which federal courts are familiar. Plaintiff is a citizen of a friendly nation, with which the United States has long had cultural contacts. An alien, understandably though unjustifiably, may prefer to bring an action for a tort in a federal court rather than in a local court, and Congress has authorized him to do so in this limited class of cases. The importance of foreign relations to our country today cautions federal courts to give weight to such considerations and not to decline jurisdiction given by an Act of Congress unless required to do so by dominant considerations.

### II.

### The Question of Relief

Since I have already held that defendants have been guilty of tortious conduct against plaintiff's rights, the question of relief must be considered. Plaintiff has stated that he does not wish to collect any damages from defendants, but seeks only the return of his daughter to his custody.

The authorities cited above show that such relief is within the power of this Court. The question remains whether it should be granted.

Plaintiff argues that the question is foreclosed by the decision of the Religious Court of Beirut in December 1959, awarding him custody of Najwa. That decision was rendered in a proceeding in which the defendant did not appear and had not been personally served with process; notice of the suit was published in two Lebanese newspapers and posted on the bulletin board of the court. Defendant and the child Najwa were then in the United States.

■ Under these circumstances, a court of the United States may recognize the decree,[6] to the same extent it would

---

6. The United States has a treaty with Lebanon, by which the rights of United States nationals are recognized, 43 Stat. 1821, 58 Stat. 1493, and evidence was

recognize a similar decree of a court of one of the United States, without being foreclosed thereby from deciding whether the equitable relief requested should be granted, and particularly, whether the granting of such relief would be in the best interests of the child. See May v. Anderson, 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221.

■ This is not an action to enforce a foreign judgment, although plaintiff's attorney sometimes argued as though it were. This Court would have no jurisdiction over such an action between the parties; the present action is sustainable only under 28 U.S.C.A. § 1350.

Alternatively, plaintiff argues that the custody of the child should be determined according to Lebanese law, and that under Lebanese law the father is entitled to custody. This argument overlooks the peculiar interest which in American jurisprudence the state of residence has in a child's custody. As Mr. Justice Frankfurter said, concurring in May v. Anderson, supra: "Property, personal claims, and even the marriage status * * * generally give rise to interests different from those relevant to the discharge of a State's continuing responsibility to children within her borders. Children have a very special place in life which law should reflect. Legal theories and their phrasing in other cases readily lead to fallacious reasoning it uncritically transferred to determination of a State's duty towards children. There are, of course, adjudications other than those pertaining to children, as for instance decrees of alimony, which may not be definitive even in the decreeing State, let alone binding under the Full Faith and Credit Clause. Interests of a State other than its duty towards children may also prevail over the interest of national unity that underlies the Full Faith and Credit Clause. But the child's welfare in a custody case has such a claim upon the State that its responsibility is obviously not to be foreclosed by a prior adjudication reflecting another State's discharge of its responsibility at another time. * * *" 345 U.S. at page 536, 73 S.Ct. at page 844.

Moreover, plaintiff has invoked the equitable jurisdiction of this Court; when "the action is one in equity, * * 'equity will administer such relief as the exigencies of the case demand at the close of the trial'." Chapman v. Sheridan-Wyoming Co., 338 U.S. 621, at page 630, 70 S.Ct. 392, at page 397, 94 L.Ed. 393. See also 19 Am.Jur., Equity, secs. 121–123.

■ While Lebanese law and the applicable principles of the general Mohammedan law should be and have been accorded consideration and respect, the best interests of the child must be the dominating consideration in determining whether the relief requested should be granted. Dietrich v. Anderson, 185 Md. 103, 116, 43 A.2d 186; Melton v. Connolly, 219 Md. 184, 148 A.2d 387. It is immaterial whether on this question I follow Maryland law, or "forge" new federal law; the result must be the same.

It is most unfortunate that defendant has poisoned the natural respect and affection which Najwa should have for her father. I was impressed by his sincere devotion to the best interests of his daughter and by the desire of his wife to have Najwa with them, at least part of the time. Plaintiff offers Najwa a very high social position in the Arab world, and other advantages in keeping with her racial and religious background.

Defendants offer her equal affection, but different opportunities. Najwa is doing well at the desegregated Woodbourne Junior High School in Baltimore[7] and is enjoying the excitement of being a pioneer in developing inter-racial so-

offered tending to prove that judgments of courts in the United States are granted full faith and credit by Lebanese courts, on grounds of comity.

7. She would undoubtedly do well and obtain a good education at the American schools in Teheran or the schools in Lebanon, to which her father proposes to send her.

cial relations. One may doubt whether the enjoyment will last, but one must recognize the broad humanity behind the views which the child now holds.

The Court gives greater weight than Dr. Eisenberg to the fact that Najwa was born a Moslem and still regards herself as such, and the Court has more respect than the doctor displayed for the teachings of the Mohammedan law. But I cannot disregard the able doctor's opinion, expressed after weighing the relevant factors, especially since the factors he emphasized are those which have been emphasized by the Court of Appeals of Maryland and other American courts. See e. g. Dietrich v. Anderson, supra; Melton v. Connolly, supra. Najwa's expressed desire to remain with her mother must also be considered. Ross v. Pick, 199 Md. 341, 86 A.2d 463.

After carefully weighing all of the factors urged by the respective parties, I have concluded that the relief prayed must be denied.

This Court has no power to require the parents to make such concessions as will enable Najwa to have, if not the best of both worlds, a fair choice between them, and some of the advantages which each of the parents offers. I can only hope that the parents will resume their negotiations to that end.

### III.

### The Counterclaim

No independent jurisdiction for the counterclaim exists. It can be entertained at all only if the Court has jurisdiction over the plaintiff's claim, and if the counterclaim be considered a compulsory counterclaim, which is doubtful. See 3 Moore's Federal Practice, secs. 13.15 and 13.19.

As stated in the pleadings the counterclaim is not based on the Iraqi decree, which would not support a claim of one-tenth the amount sought. No demand for such payment or support has been shown, nor have defendants shown that plaintiff abandoned his daughter, as they alleged. On the contrary, Najwa was kept by her mother from any contact with her father, despite his efforts to establish such contacts in many ways. Finally, if any proof to support any recovery under the counterclaim had been offered, it would be more than offset by the damages to which plaintiff would be entitled under his claim.

### Conclusion

I will enter a judgment dismissing both the complaint and the counterclaim and directing that each side bear its own costs.