*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0066p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ROMIL RAFAEL ESTRELLA TAVERAS,
              *Plaintiff-Appellant,*

              *v.*                                            No. 06-3040

CAROLYN R. PAIEWONSKY TAVERAZ,
              *Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 05-00867—Algenon L. Marbley, District Judge.

Argued: October 27, 2006

Decided and Filed: February 16, 2007

Before: KEITH and McKEAGUE, Circuit Judges; CLELAND, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** E. Dennis Muchnicki, Dublin, Ohio, for Appellant. Jay G. Perez, Columbus, Ohio, for Appellee. **ON BRIEF:** E. Dennis Muchnicki, Dublin, Ohio, for Appellant. Jay G. Perez, Columbus, Ohio, for Appellee.

_____

**OPINION**

_____

        DAMON J. KEITH, Circuit Judge. Plaintiff-Appellant Romil Rafael Estrella Taveras appeals the district court's dismissal of his parental child abduction action brought under the Alien Tort Statute (also commonly referred to as the "Alien Tort Claims Act"), 28 U.S.C. § 1350, for lack of subject matter jurisdiction. For the reasons set forth below, we **AFFIRM** the district court's decision.

_____

[*]The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

## I. BACKGROUND

Plaintiff-Appellant Romil Rafael Estrella Taveras ("Mr. Taveras") and Defendant-Appellee Carolyn R. Paiewosky Taveraz[1] ("Ms. Taveraz") are citizens of the Dominican Republic. These individuals were once married to each other and had two children born during the marriage, both of whom are still minors. On December 22, 2003, the couple divorced in Santo Domingo, Dominican Republic, and Ms. Taveraz was granted full guardianship (or "sole physical and legal custody") of the children. (J.A. at 104).

On August 24, 2004, Ms. Taveraz traveled to the United States with the children under a visitor's visa, purportedly for a two-week vacation in Boston, Massachusetts. On September 8, 2004, while she was in the United States, Ms. Taveraz telephoned Mr. Taveras and told him to forget the children because she would never return to the Dominican Republic. A couple of weeks later, Mr. Taveras discovered that Ms. Taveraz and the children were living with Ms. Taveraz's family in Westerville, Ohio.

On October 28, 2004, Mr. Taveras filed a criminal complaint with the District Attorney for the Dominican Republic alleging that Ms. Taveraz was unlawfully withholding their children from the Dominican Republic. Later, on December 21, 2004, Mr. Taveras filed a civil action in the Santo Domingo, Dominican Republic Court of Children and Adolescents ("Santo Domingo family court"), seeking to terminate Ms. Taveraz's guardianship and to establish himself as the children's guardian. On July 14, 2005, the Santo Domingo family court ordered the return of Ms. Taveraz and the children to the Dominican Republic to appear for a hearing to be held on September 1, 2005. Neither Ms. Taveraz nor the children returned to the Dominican Republic for this or any other hearing.

On September 20, 2005, Mr. Taveras filed an action against Ms. Taveraz in the United States District Court for the Southern District of Ohio alleging parental child abduction. Mr. Taveras asserted his claims pursuant to the Full Faith and Credit Clause of the Constitution, U.S. Const. art. IV § 1; The Hague Convention on the Civil Aspects of International Child Abduction of October 25, 1980 ("The Hague Convention" or "The Hague Convention of 1980"), 19 I.L.M. 1501 (1980); and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601-11610 (codifying The Hague Convention). Mr. Taveras sought a declaratory judgment that the children were being unlawfully withheld from their country of habitual residence; an order that the children be returned to the Dominican Republic to appear before the Santo Domingo family court for a redetermination of their guardianship; and an order placing the children in the temporary custody of Mr. Taveras for the purpose of assuring their appearance at the Santo Domingo family court proceedings.

On October 7, 2005, Ms. Taveraz moved to dismiss the action for lack of subject matter jurisdiction on the grounds that the ICARA and The Hague Convention could not supply jurisdiction since the Dominican Republic is not a member of The Hague Convention. On October 24, 2005, Mr. Taveras amended his complaint to include a cause of action under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350. Thereafter, both parties briefed the district court on the issue of subject matter jurisdiction, and a hearing was held on October 25, 2005 regarding Ms. Taveraz's motion to dismiss.

On November 3, 2005, the district court granted the motion to dismiss. The district court held that it did not have jurisdiction under The Hague Convention or the ICARA because the United States has not declared its acceptance of the Dominican Republic's accession to The Hague

---

[1]Ms. Taveraz's last name also appears in the record with the alternate spelling "Taveras."

Convention.  *Taveras v. Taveras*, 397 F. Supp. 2d 908, 912 (S.D. Ohio 2005).  Additionally, and more centrally to the issues on appeal, the district court held that it did not have jurisdiction under the ATS because Mr. Taveras's allegations did not qualify as a violation of any treaty or the law of nations, and the result of permitting such a cause of action would have the practical ramification of "turning district courts nationwide into ill-suited family courts."  *Id*. at 915.

On January 11, 2006, Mr. Taveras filed the instant appeal, challenging the district court's order dismissing his action for lack of subject matter jurisdiction.  Mr. Taveras does not dispute the district court's holding that The Hague Convention and the ICARA do not provide any independent basis for jurisdiction.  (Tr. Oral Arg. at 16:20-25 (audio recording)).  Rather, the present appeal primarily centers on whether the district court had subject matter jurisdiction over the parental child abduction action pursuant to the ATS.

## II.  STANDARD OF REVIEW

This Court reviews a district court's grant of a motion to dismiss for lack of subject matter jurisdiction *de novo*.  *Genord v. Blue Cross & Blue Shield of Mich.*, 440 F.3d 802, 805 (6th Cir. 2006) (citing *Simon v. Pfizer Inc.*, 398 F.3d 765, 772 (6th Cir. 2005)).

## III.  ANALYSIS

### A.  Alien Tort Statute

The ATS was passed by the First Congress in 1789.  Judiciary Act of 1789, ch. 20, § 9(b), 1 Stat. 73, 76-77 (codified, as amended, at 28 U.S.C. § 1350 (2000)).  After slight modifications, the ATS provides in its entirety:  "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  During the first 191 years of its existence, the ATS lay effectively dormant.  In fact, during the nearly two centuries after the statute's promulgation, jurisdiction was maintained under the ATS in only two cases.  The earliest case to find jurisdiction under the ATS, *Bolchos v. Darrel*, 3 F.Cas. 810 (D.S.C. 1795) (No. 1,607), employed the ATS as an alternative basis for jurisdiction to uphold the capture of Black slaves from an enemy ship at sea and to order the return of the slaves or the money arising from their sale by a libelee who had subsequently seized and sold the enslaved people.

Although the first case employing the ATS used the statute to perpetuate the inhumane institution of slavery, beginning in 1980 with the seminal case *Filartiga v. Pena-Irala*, the ATS has been utilized to address egregious international human rights abuses in the federal courts.  630 F.2d 876 (2d Cir. 1980) (holding that torture perpetrated under the color of law violates universally accepted norms of international law, and thus the ATS provides federal jurisdiction when an alleged torturer is found and served with process by an alien within the borders of the United States); *see also, e.g.*, *Abebe-Jira v. Negewo*, 72 F.3d 844 (11th Cir. 1996) (suit brought by ex-prisoners against a quondam governmental official of a former Ethiopian military dictatorship for torture); *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) (action brought by Croat and Muslim victims from Bosnia-Herzegovina against self-proclaimed president of an unrecognized Bosnian-Serb entity for genocidal campaign of murder, rape, forced impregnation and prostitution, and torture); *In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467 (9th Cir. 1994) (lawsuit brought by families of victims of torture, summary execution, and disappearances against former president of the Phillippines).

The ATS holds great potential to bring justice to certain serious violations of human, civil, and environmental rights in a federal forum.  However, the ATS, by no means, supplies jurisdiction over every wrong committed against an alien.  In cases — such as the one at bar — where the alleged tort purportedly arises under the law of nations, rather than a treaty of the United States, the

Supreme Court has directed the lower courts to exercise "great caution in adapting the law of nations to private rights." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 728 (2004).

In *Sosa*, the Supreme Court, for the first time, set forth a framework to determine whether a cause of action falls within the purview of the ATS. *Id.* at 725. The Court, relying on *Blackstone's Commentaries on the Laws of England*, found that at the time the ATS was enacted only three actions were generally recognized as infractions of the law of nations: piracy, offenses against ambassadors, and violations of safe conducts. *Id.* at 724 (citing 4 William Blackstone, *Commentaries on the Laws of England* (1769) ("Blackstone's Commentaries")). The *Sosa* majority held that, in addition to these traditional law of nations violations, other causes of action based upon present-day law of nations may be cognizable under the ATS if the claim both "rest[s] on a norm of international character accepted by the civilized world and [is] defined with a specificity comparable to the features of the [aforementioned] 18th-century paradigms[.]" *Id.* at 725.

In other words, "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted[,]" *id.* at 732, to wit, piracy, offenses against ambassadors, and violations of safe conducts. As such, the *Sosa* Court concluded that "judicial power [pursuant to the ATS] should be exercised on the understanding that the door is still ajar subject to vigilant doorkeeping, and thus open to a narrow class of international norms today." *Id.* at 729.

In the present appeal, Mr. Taveras submits that the district court has subject matter jurisdiction pursuant to the ATS since Ms. Taveraz's conduct violated the law of nations under the traditionally recognized doctrine of safe conducts[2] or, alternatively, because there is an international consensus against parental child abduction.

### 1. Safe Conducts

The gravamen of Mr. Taveras's ATS claim is that Ms. Taveraz's actions of entering the United States under a visitor's visa when she intended to permanently immigrate with their two children amounted to a fraudulent entry and, accordingly, violated the terms for safe conducts under the law of nations. Specifically, Mr. Taveras contends that the doctrine of safe conducts in the United States is embodied in the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.*, and that Ms. Taveraz violated the INA when she obtained admission into the United States by fraudulently misrepresenting her intent to abandon her foreign residency and permanently immigrate to the United States.[3] *See* 8 U.S.C. § 1182(a)(6)(C)(i) (providing that an alien who procures a visa by fraud or willful misrepresentation of a material fact is inadmissible). Mr. Taveras posits that Ms. Taveraz's fraudulent entry deprived "the United States . . . of *its* right under the law of nations to make a valid determination as to whether the U.S. wanted to grant" safe conduct to a cross-border child abductor. (Appellant's Br. at 18) (emphasis added). Mr. Taveras further submits that

---

[2]In passing, Mr. Taveras presents a peripheral argument that his action is tied into the law of nations under the 18th-century paradigm of piracy pursuant to a hostage taking analogy as defined by Blackstone. (Appellant's Br. at 12; Tr. Oral Arg. at 5:56-6:03 (audio recording)). This argument is wholly unfounded and warrants little attention. A fundamental element of the offense of piracy is that the acts of robbery or depredation must have been committed *upon the high seas*. 4 Blackstone, *supra*, at 71-72. As the events giving rise to the parental child abduction action did not occur upon the high seas, we summarily reject the argument that piracy can form a basis for jurisdiction under the ATS in the present case.

[3]As the present appeal is a review of a dismissal for lack of subject matter jurisdiction, we take the factual allegation that Ms. Taveraz entered the United States with an intent to remain permanently as true. *See Buchanan v. Apfel*, 249 F.3d 485, 488 (6th Cir. 2001) (stating that when reviewing the grant of a motion to dismiss for lack of subject matter jurisdiction "we must accept all factual allegations in the complaint as true").

*Blackstone's Commentaries* establishes that "the law of [safe conducts or] safe passage involve[s] the *rights of sovereigns* to allow non-sovereigns to enter into and stay into the country and set conditions of it." (Tr. Oral Arg. at 6:13-25, 9:40-49 (audio recording); *see also* Appellant's Br. at 16-17).

Mr. Taveras misinterprets what constitutes a violation of safe conducts under the law of nations. A safe conduct is defined as: "1. A privilege granted by a belligerent allowing an enemy, a neutral, or some other person to travel within or through a designated area for a specified purpose. 2. A document conveying this privilege." *Black's Law Dictionary* 1336 (7th ed. 1999). Thus, the term "safe conducts" refers to both a privilege granted to an alien providing for safe travel within and through a nation and the document imparting that privilege. *Id.* "The express safe-conduct *document* [of the late 18th-century] was similar to the modern concept of the passport, which entitles a bearer with a valid visa to safe passage to, within, and out of a foreign land pursuant to a treaty or an agreement negotiated by his or her sovereign and the host sovereign." Thomas H. Lee, *The Safe-Conduct Theory of the Alien Tort Statute*, 106 Colum. L. Rev. 830, 874 (2006) (emphasis added). Blackstone makes it clear that a violation of safe conducts occurs when an alien's privilege to pass safely within and through the host nation is infringed and the alien consequently suffers injury to their "person or property." 4 Blackstone, *supra*, at 68-69. Specifically, Blackstone has expounded:

> [*V*]*iolation* of *safe-conducts* or *passports*, expressly granted by the king or his embassadors to the subjects of a foreign power in time of mutual war; or committing acts of hostilities against such as are in amity, league, or truce with us, who are here under a general implied safe-conduct: these are breaches of the public faith, without the preservation of which there can be no intercourse or commerce between one nation and another: and such offences may, according to the writers upon the law of nations be a just ground of a national war; since it is not in the power of the foreign prince to cause justice to be done to his subjects by the very individual delinquent, but he must require it of the whole community. And as during the continuance of any safe-conduct, either express or implied, the foreigner is under the protection of the king and the law . . . ; there is no question but that any violation of either the person or property of such foreigner may be punished by indictment in the name of the king, whose honour is more particularly engaged in supporting his own safe-conduct.

*Id.* (internal citation omitted).

The works of Blackstone and celebrated early legal commentator Emmerich de Vattel demonstrate that the First Congress in all likelihood understood that "a safe conduct signified a sovereign obligation on the part of the United States to prevent injury to the person or property of an alien within its territory and also abroad where it had a military presence." Lee, *supra*, at 873 (relying on 4 Blackstone, *supra*, at 68-70; Emmerich de Vattel, *The Law of Nations, or, Principles of the Law of Nature, Applied to the Conduct and Affairs of Nations and Sovereigns* 479-80 (Northampton, Mass., Simeon Butler 4th Am. ed. 1820) (1758)). Thus, the purpose of the doctrine of safe conducts under the law of nations is to protect the safety and security of the person and property of the journeying alien bearing the safe conduct privilege (and consequently to preserve commercial and diplomatic relationships between the alien's host and home countries). It follows that the purpose of the safe conducts doctrine is not — as Mr. Taveras suggests — to protect, or

otherwise guard, the host nation from aliens who might procure fraudulent entry into the nation.[4]

Ms. Taveraz and her children were granted a safe conduct document, in the form of a visitor's visa, to travel within and through the United States. This is the only safe conduct implicated in the present case. As the benefit and protection of the doctrine of safe conducts, by definition, resides with the alien holding the safe conduct document, the fact that Ms. Taveraz may have gained fraudulent entry into the United States (or otherwise transgressed federal immigration law) cannot support a cause of action for a violation of safe conducts under the ATS. As set forth above, for a violation of an express safe conduct to occur, the alien's privilege to safe passage, which was bestowed by the safe conduct document, must have been infringed and the alien must have consequently suffered an injury to their person or property. 4 Blackstone, *supra*, at 68-69. According to the record, there has been no infraction of the safe passages of Ms. Taveraz or the children to, within, or out of the United States, nor any injury to their persons or property. Hence, the instant case does not evince any violation of safe conducts.

Mr. Taveras's argument is flawed not only because it misconstrues the meaning of safe conducts as understood by the First Congress and modernly, but also because there is a glaring absence of a nexus between his asserted injury and the alleged violation of the rights of the United States to control who enters its borders. In other words, even assuming, *arguendo*, that Ms. Taveraz's fraudulent entry constituted a violation of the law of nations because it infringed upon the rights of the United States, there is an insufficient nexus between this violation and the alleged tort committed against Mr. Taveras. This defect in Mr. Taveras's argument apparently stems from his misguided reliance on an outdated district court case from another circuit, *Adra v. Clift*, 195 F. Supp. 857 (D. Md. 1961), which was effectively overruled by the Supreme Court in *Sosa*.

*Adra* involved a suit between two divorced Sunnite Muslim parents, a Lebanese father and an Iraqi national mother, over the custody of their minor daughter who had Lebanese citizenship. In 1954, the mother included the Lebanese daughter on her Iraqi passport, concealing the child's full name and nationality. *Id.* at 861. Similarly, in 1958, the mother failed to disclose the daughter's nationality and full name when applying for a visa, and thereby gained entrance to the United States for herself and her daughter. *Id.* The mother then married an American citizen, and the mother and daughter established permanent residence in Maryland. *Id.* at 861-62. Under then-existing Lebanese law, which was rooted in Mohammedan law and governed domestic relations of Muslims in Lebanon, a mother's custody over a girl child automatically terminated and vested in the father when the child attained nine years of age. *Id.* at 860. In 1959, the father successfully obtained a judgment in the Religious Court of Beirut against the mother for the custody and return of the daughter. *Id.* at 862. After the mother refused to relinquish the child, the father brought suit in the United States District Court for the District of Maryland under the ATS, seeking a decree ordering the mother to deliver the daughter to his custody. *Id.* at 859.

Prior to *Adra*, jurisdiction under the ATS had been found in only one other case, *Bolchos v. Darrel*, 3 F.Cas. 810. In the absence of any notable precedent, the district court in *Adra* promulgated the following two-part test to determine whether jurisdiction over a cause of action arose under the ATS: (1) has a cognizable tort been alleged or proven, and (2) was the tort committed in violation of the law of nations or a treaty of the United States? *Adra*, 195 F. Supp. at

---

[4]This is, of course, not to say that the United States does not have a right to determine who should enter its borders and upon what terms such entry should be granted. The United States' interests in regulating immigration and its terms and conditions are addressed in the INA, which provides procedures to combat and rectify fraudulent entry. In the present appeal, the issue of whether Ms. Taveraz violated the INA is not before the Court. Rather, the question presented is whether Ms. Taveraz's fraudulent entry, as alleged, violates the doctrine of safe conducts so as to provide jurisdiction under the ATS.

862-63. Applying this analysis, the district court found that a tort had been committed because, pursuant to Lebanese law, the father was entitled to custody of the child since she was already more than nine years old and the mother had removed and withheld the child from the father. *Id.* As to the second prong, the court found that the mother's inclusion of the child in her Iraqi passport and concealment of the daughter's name and nationality to effectuate the child's admittance into the United States violated the law of nations because it was a wrongful act against the United States and "the Lebanese Republic, which is entitled to control the issuance of passports to its nationals." *Id.* at 864-65. In reaching this conclusion, the court did not engage in a traditional law of nations analysis, but instead briefly mentioned the importance of passports in international law. *Id.* at 865.

Mr. Taveras's heavy reliance on *Adra* is misplaced because the ATS formulation developed in *Adra* cannot be reconciled with the ATS jurisdictional analysis set forth by the Supreme Court in *Sosa*. In *Adra*, the district court employed a bifurcated analysis where the plaintiff's substantive claim was rooted exclusively in domestic tort (withholding of custody) and the law of nations was only incidentally implicated by virtue of the defendant's inclusion of fraudulent information on a passport and visa. Although the plaintiff's cause of action, standing alone, did not bespeak a law of nations violation, the *Adra* court found jurisdiction under the ATS on the grounds that the fraudulent passport triggered the law of nations. Pursuant to the *Adra* test, for jurisdiction to vest under the ATS, there need be only a tenuous nexus between the alleged tort and violation of the law of nations. Thus, under *Adra*, a tort need not be in violation of the law of nations to be cognizable under the ATS, as long as the commission of the tort collaterally involved an infraction of the law of nations.

Very few courts have adopted the framework developed in *Adra*. Rather, the majority of courts faced with ATS jurisdiction questions have employed the analysis set forth by the United States Court of Appeals for the Second Circuit in *Filartiga*, 630 F.2d at 880-81. Unlike *Adra*, a fundamental premise underlying the *Filartiga* analysis is that, in order for the ATS to confer jurisdiction, the alleged tortious conduct must violate the law of nations. *Id.* at 880. Put differently, a collateral or incidental connection between the alleged tort and law of nations violation is insufficient; the tort itself must be a direct violation of the law of nations to arise under the ATS. This jurisdictional requirement stands in stark contrast with the bifurcated test presented in *Adra*. "The *Filartiga* formulation posits a violation of the law of nations as the trigger for section 1350 jurisdiction. [While the less rigorous] *Adra* formulation adopts a two-step jurisdictional test, requiring what would appear to be a looser allegation of a law of nations offense, coupled with a municipal tort." *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 787 (D.C. Cir. 1984) (Edwards, J., concurring). "[I]t is clear that the *Filartiga* and *Adra* formulations might produce radically different results. . . . [Under the facts of *Adra*,] jurisdiction would fail under the *Filartiga* formulation, because the law of nations violation . . . caused plaintiff no harm, and plaintiff could not sue under section 1350 for the domestic tort." *Id.* at 788.

The test set by the *Filartiga* court to determine whether the conduct of a defendant amounts to a law of nations violation is: whether the alleged tortious conduct violates well-established universally recognized norms of international law for which there is "'general assent of civilized nations.'" *Filartiga*, 630 F.2d at 881 (quoting *The Paquete Habana*, 175 U.S. 677, 694 (1900)). The appropriate sources of international law "'may be ascertained by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing and enforcing that law.'" *Id.* at 880 (quoting *United States v. Smith*, 18 U.S. (5 Wheat) 153, 160-61 (1820)). "It is only where the nations of the world have demonstrated that the wrong is of mutual, and not merely several, concern, by means of express international accords, that a wrong generally recognized becomes an international law violation within the meaning of the statute." *Id.* at 888.

In *Sosa*, the Supreme Court generally affirmed the law of nations paradigm set forth in *Filartiga*. 542 U.S. at 731 ("The position we take today has been assumed by some federal courts for 24 years, ever since the Second Circuit decided *Filartiga v. Pena-Irala*[.]"). After *Sosa*, it is incontrovertible that not only must a cause of action directly implicate the law of nations, jurisdiction under the ATS can be found only if the claim implicates a law of nations norm that is as clearly defined and accepted among civilized nations as the historical models recognized when the ATS was enacted. *Id.* at 725, 732.

In the present case, the nexus between Mr. Taveras's asserted injury and the alleged law of nations violation (that the right of the United States to control who enters its borders was infringed) is highly tenuous, at best. As *Sosa* definitively established that the underlying tort itself must be in violation of the law of nations to be cognizable under the ATS, we reject Mr. Taveras's *Adra*-styled argument that Ms. Taveraz's fraudulent entry into the United States is sufficient to implicate a law of nations infraction and thereby propel his purely domestic[5] tort action within the jurisdictional ambit of the ATS.

## 2. *International Consensus Concerning Parental Child Abduction*

We turn, apropos, to a more pertinent inquiry raised by the present appeal: Whether cross-border "parental child abduction" by an individual with full guardianship (or custody) violates the law of nations pursuant to the ATS. It is uncontested that there is no treaty of the United States that is directly controlling or enforceable over the present dispute.[6] Accordingly, "'resort must be had to the customs and usages of civilized nations[,]'" *id.* at 734 (quoting *The Paquete Habana*, 175 U.S. at 700), with the ultimate inquiry being whether "parental child abduction," as described in the complaint, "has attained the status of binding customary international law[,]" *id.* at 735.

Mr. Taveras submits that an international consensus against parental child abduction is established through three different international agreements: (1) The Hague Convention (on the Civil Aspects of International Child Abduction of October 25, 1980), 19 I.L.M. 1501 (1980), (mentioned above); (2) The Hague Convention on Jurisdiction, Applicable Law, Recognition, Enforcement and Co-operation in Respect of Parental Responsibility and Measures for the Protection of Children of October 19, 1996 ("The Hague Convention of 1996"), 35 I.L.M. 1391 (1996); and (3) The United Nations Convention on the Rights of the Child of November 20, 1989, 1577 U.N.T.S. 3, 28 I.L.M. 1448 (1989). In succession, we consider each of these sources of law.

The Hague Convention of 1980, which has 75 member states and an additional 20 non-member accession states, was adopted "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." The Hague Convention of 1980, pmbl. We reject Mr. Taveras's argument that The Hague Convention demonstrates an international censure against "parental child abduction," as described in the complaint, for the simple reason that the challenged conduct does not appear to be the type of conduct condemned by The Hague Convention.

---

[5]As discussed below, we ultimately find that "parental child abduction," as described in the complaint, does not violate the law of nations.

[6]Ms. Taveraz's appellate brief focuses on the unchallenged fact that The Hague Convention does not directly confer jurisdiction over the action. In fact, Ms. Taveraz allocated less than two pages to addressing the issue of whether her conduct constitutes a violation of the law of nations under the ATS. Ms. Taveraz apparently misconstrues Mr. Taveras's argument that although The Hague Convention and the other cited treaties or conventions are not controlling themselves, these sources demonstrate an international consensus condemning cross-border parental child abduction.

In his appellate brief, Mr. Taveras relies primarily on Article III of The Hague Convention which provides in pertinent part: "The removal or the retention of a child is to be considered wrongful where — a[)] it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and b[)] at the time of removal or retention those rights were actually exercised . . . or would have been so exercised but for the removal or retention." The Hague Convention of 1980, ch. I, art. III. In other words, removal or retention is wrongful under The Hague Convention if "a parent has taken a child out of a country in violation of the other parent's custody rights." *Gonzalez v. Gutierrez*, 311 F.3d 942, 945 (9th Cir. 2002).

It is widely recognized that The Hague Convention only provides substantive remedies for custodial parents. *See Cantor v. Cohen*, 442 F.3d 196, 209-10 (4th Cir. 2006). The Hague Convention "provides the remedy of return *only* for a parent who has 'rights of custody.'" *Gonzalez*, 311 F.3d at 945 (citing The Hague Convention, ch. III, art. XII). A parent without custody rights, such as Mr. Taveras, is not entitled to the remedy of return or any other judicial remedy. *See* The Hague Convention, ch. III, art. XII (providing for a judicial remedy of return for a parent with custody rights),[7] ch. IV, art. XXI (providing a purely procedural mechanism (application to the administrative "Central Authorities of the Contracting States") for non-custodial parents seeking rights of access). Here, we find, under the plain language of Article III and in light of the fact that The Hague Convention only provides substantive remedies to custodial parents, that Ms. Taveraz's removal and retention of the children does not appear to have been wrongful within the meaning of the convention because it was not in "breach of rights of custody," since at the time of removal and retention Ms. Taveraz had — and continues to have — full legal and physical guardianship or custody over the children under the laws of the Dominican Republic. *See id.*, ch. I, art. III(a); J.A. at 104.

Mr. Taveras attempts to avoid this shortcoming by disregarding the custody rights language of Article III, and arguing that Ms. Taveraz's removal and retention of the children was wrongful under The Hague Convention because it violated the laws of the Dominican Republic. Specifically, Mr. Taveras argues that Ms. Taveraz's actions violated the written travel consent requirement of the Dominican Republic's Law No. 136-03 Code for the Protection of the Rights of Children and Adolescents ("New Code of the Minor Law No. 136-03") (known by its Spanish name "*Ley No. 136-03 Código para la Protección de los Derechos de los Niños, Niñas y Adolescentes*"). We reject this argument for two reasons.

First and foremost, as discussed above, Ms. Taveraz's removal and retention of the children does not appear to be "considered wrongful" within the meaning of The Hague Convention because it was not "in breach of rights of custody" under the law of the Dominican Republic. *See* The Hague Convention, ch. I, art. III(a). Essentially, Mr. Taveras asks the Court to read Article III to mean that removal or retention of a child is wrongful where it is in breach of the law of the children's home country. Mr. Taveras would have the Court ignore Article III's custody rights language, which provides that "removal or retention of a child is to be considered wrongful where . . . it is in breach of *rights of custody* . . . under the law of the State in which the child was habitually resident immediately before the removal or retention[.]" *Id.* ch. I, art. III (emphasis added). Reading the convention as a whole, it is clear that removal or retention of a child is wrongful only when "it is in breach of rights of custody" under the law of the child's home country, not when the removal or retention simply violates the home country's general laws which do not govern custody. A faithful

---

[7] We note that unlike The Hague Convention, the ICARA, 42 U.S.C. § 11603, does provide for judicial remedies for non-custodial parents, namely for rights of access claims (*e.g.*, visitation). However, in the proceedings below and on appeal, Mr. Taveras does not point to the ICARA as a source that demonstrates an international consensus against parental child abduction. Even if Mr. Taveras had cited to the ICARA, such reliance would have been ineffectual since it is a purely domestic statute and does not evince the established norms of any other nation.

reading of Article III mandates the conclusion that removal or retention of a child is wrongful only when it is in breach of the complainant parent's custody rights. As such, Mr. Taveras's argument flatly fails.

Second, even if we were to assume, wholly *arguendo*, that a violation of the written travel consent requirement of the Dominican Republic New Code of the Minor Law No. 136-03 made the removal and retention of the children wrongful within the meaning of The Hague Convention, Mr. Taveras's argument would fail because it appears from the record that Ms. Taveraz did not violate this statute. Article 204 of the New Code of the Minor Law No. 136-03 provides in relevant part: "If one of the parents is going to leave the country with one of their children, the parent will not be able to do so without the written consent of the other." New Code of the Minor Law No. 136-03, tit. V, ch. II, art. 204, para.; J.A. at 24. Article 110 of this statute further provides in part that "[w]hen a person goes beyond their rights which have been recognized; retains a boy, girl, or adolescent, or moves him to a place or country different from that which is his habitual residence, without the necessary authorization, it will be considered an illegal movement or retention of the boy, girl, or adolescent. The Public Ministry of Boys, Girls, and Adolescents must return the boy, girl, or adolescent [to the person] that legally has guardianship." New Code of the Minor Law No. 136-03 at tit. IV, ch. V, art. 110; J.A. at 19, 23.

It is undisputed that Ms. Taveraz traveled with the children from the Dominican Republic to the United States on August 24, 2004. She obtained Mr. Taveras's oral consent to take the children for a two week vacation to Boston, but did not procure any written consent for the children to travel outside of the Dominican Republic. Based upon these facts, Mr. Taveras submits that Ms. Taveraz violated the Dominican Republic's New Code of the Minor Law No. 136-03 because she did not obtain his written consent to remove the children from the Dominican Republic. This argument is unpersuasive. It is undisputed that the Dominican Republic's New Code of the Minor Law No. 136-03 did not go into effect until October 17, 2004, nearly eight weeks after Ms. Taveraz traveled with the children. *See* Dominican Republic Law No. 136-03 Code for the Protection of the Rights of Children and Adolescents; *see also* J.A. at 83 (official letter from the Dominican Republic Secretariat of State of Interior and Police General Directorate of Migration stating that when Ms. Taveraz departed the Dominican Republic with her children, "[a]t that time the said minors did not need permission to migrate, nor authorization from one parent to the other as is established under the new Code of the Minor, if they were to travel with one of the parents."). As the written consent requirement was not in effect at the time Ms. Taveraz emigrated with the children, and since there is no indication that this statute can be retroactively applied, Ms. Taveraz did not infringe the Dominican Republic's New Code of the Minor Law No. 136-03.

Mr. Taveras also relies on The Hague Convention of 1996. This international agreement has been joined by approximately twelve states, and reaffirms and broadens the principles set forth in The Hague Convention of 1980. Mr. Taveras does not point to any particular provision of The Hague Convention of 1996 or provide any explanation of how it purportedly lends additional support to his proposition that there is an international consensus against cross-border removal and retention of a child by a parent with full guardianship or custody. In fact, Mr. Taveras's discourse on the convention does not go beyond the cursory background we have provided here. (Appellant's Br. at 11-12). In our examination of the norms reflected in The Hague Convention of 1996 concerning the international removal or retention of a child, we find no significant difference from the original 1980 Hague Convention. Verily, The Hague Convention of 1996 adopts, verbatim, the definition of wrongful removal or retention of a child from The Hague Convention of 1980. The Hague Convention of 1996, ch. II, art. VII(2)(a)-(b).

As Ms. Taveraz's conduct of removing and withholding the children does not appear to have been "wrongful" within the meaning of Article III of The Hague Convention of 1980 or Article VII of The Hague Convention of 1996, we find that these international agreements provide little

persuasive authority or indication that the cross-border removal and subsequent retention of children by a parent with full guardianship or custody violates a norm of customary international law.

We turn now to the United Nations Convention on the Rights of the Child of November 20, 1989 ("U.N. Convention"). Approximately 193 countries are parties to this convention. The United States has not joined the convention. Mr. Taveras relies on six articles of the U.N. Convention: 7, 8, 9, 11, 19, and 35, none of which squarely addresses the conduct at issue. Article 7 provides:

> The child shall be registered immediately after birth and shall have the right from birth to a name, the right to acquire a nationality and, as far as possible, the right to know and be cared for by his or her parents. States Parties shall ensure the implementation of these rights in accordance with their national law and their obligations under the relevant international instruments in this field, in particular where the child would otherwise be stateless.

U.N. Convention on the Rights of the Child, pt. I, art. VII. Article 8 states in relevant part that "States Parties undertake to respect the right of the child to preserve his or her identity, including nationality, name and family relations as recognized by law without unlawful interference." *Id.* at pt. I, art. VIII(1).

> Article 9 concerns the separation of children from their parents and provides in part that:

> States Parties shall ensure that a child shall not be separated from his or her parents against their will, except when competent authorities subject to judicial review determine . . . that such separation is necessary for the best interests of the child. Such determination may be necessary in a particular case such as one involving abuse or neglect of the child by the parents, or one where the parents are living separately and a decision must be made as to the child's place of residence. . . . States Parties shall respect the right of the child who is separated from one or both parents to maintain personal relations and direct contact with both parents on a regular basis[.]

*Id.* at pt. I, art. IX(1), (3). Article 11 directs in pertinent part that "States Parties shall take measures to combat the illicit transfer and non-return of children abroad." *Id.* at pt. I, art. XI(1). Article 19 provides essentially that member states shall take action to protect children "from all forms of physical or mental violence, injury or abuse, neglect or negligent treatment, maltreatment or exploitation, including sexual abuse, while in the care of parent(s)" or other guardians. *Id.* at pt. I, art. XIX(1). Finally, Article 35 states that member "Parties shall take all appropriate national, bilateral and multilateral measures to prevent the abduction of, the sale of or traffic in children for any purpose or in any form." *Id.* at pt. I, art. XXXV.

Upon reviewing the U.N. Convention on the Rights of the Child, we find some, albeit meager, support for Mr. Taveras's contention that the international agreement sufficiently evinces a denouncement of cross-border removal and retention of children by a parent with full guardianship or custody. Article 11 adds little to Mr. Taveras's claim because it states only that "Parties will take measures to combat the illicit transfer and non-return of children abroad[,]" without defining what constitutes an "illicit transfer and non-return." *Id.* at pt. I, art. XI(1). Similarly, Article 35, provides that parties shall prevent the "abduction" of children "in any form," but the convention does not indicate that the actions taken by Ms. Taveraz, a parent with full guardianship or custody, qualify as abduction under this provision. *Id.* at pt. I, art. XXXV. Article 19 is inapplicable to the present case because there is no allegation in the complaint that the children have been subject to any abuse, neglect, or other maltreatment. The remaining cited articles articulate certain rights of children that are applicable to the present case, to wit, the rights to know and be cared for by their parents; to

preserve family relations; to not be separated from their parents against their will; and to maintain personal relationships and have direct contact with both parents. However, when examined against the backdrop of *Sosa*, we find that the U.N. Convention on the Rights of the Child does not address the conduct challenged in the complaint with sufficient particularity, and thus cannot be interpreted to convincingly express condemnation of this conduct.

In considering new causes of action under the ATS, the *Sosa* Court urged judicial caution, emphasizing that "Congress intended the ATS to furnish jurisdiction for a relatively modest set of actions alleging violations of the law of nations[,]" *Sosa*, 542 U.S. at 720, and that "there are good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action[,]" *id.* at 725. In *Sosa*, the plaintiff argued that his arbitrary arrest, which occurred when he was abducted and detained for approximately one day to be transferred from his native Mexico to the United States to face prosecution, violated the law of nations. Specifically, the plaintiff argued that the law of nations prohibits "'arbitrary' detention defined as officially sanctioned action exceeding positive authorization to detain under the domestic law of some government[.]" *Id.* at 736. In support of his argument, the plaintiff, *inter alia*,[8] pointed to two well-known international agreements: the United Nations Universal Declaration of Human Rights of December 10, 1948, G.A. Res. 217A (III) and the United Nations International Covenant on Civil and Political Rights of December 19, 1996, 999 U.N.T.S. 171. *Id.* at 734. Article 9 of the Universal Declaration of Human Rights provides: "No one shall be subjected to arbitrary arrest, detention or exile." Universal Declaration of Human Rights, art. IX. Article 9 of the International Covenant on Civil and Political Rights provides in part: "Everyone has the right to liberty and security of person. No one shall be subjected to arbitrary arrest or detention. No one shall be deprived of his liberty except on such ground and in accordance with such procedure as are established by law." International Covenant on Civil and Political Rights, pt. III, art. IX (1). In response, the *Sosa* Court found the plaintiff's showing to be deficient because he "cite[d] little authority that a rule [against arbitrary detention] so broad has the status of a binding customary norm today." *Sosa*, 542 U.S. at 736.

Here, the sources of law Mr. Taveras points to are far less recognized and specific than the authorities relied upon by the plaintiff in *Sosa*. Collectively considering all of the sources of law proffered by Mr. Taveras, we find that a cause of action based upon "parental child abduction," as defined in the complaint, fails to satisfy both the minimum threshold of international acceptance and the specificity requirement set forth in *Sosa*. *Id*. at 725. A custodial parent's cross-border transfer of minor children under a visitor's visa into the United States when she intends to remain with the children in the United States permanently, thereby withholding the children from their father in the Dominican Republic, does not sufficiently "rest on a norm of international character accepted by the civilized world[.]" *Id.* Further, this conduct is not a violation of international norms "defined with a specificity comparable to the features of the 18th-century paradigms" identified by the Supreme Court (offenses against ambassadors, piracy, and violations of safe conducts) or the present-day law of nations violations — such as torture, genocide, and extrajudicial killings — recognized by lower courts. *Id.* Mr. Taveras has simply failed to produce sufficient evidence that there is an international consensus that the sort of "parental child abduction" alleged in the complaint is a wrong so generally and universally recognized that it becomes a violation of the law of nations within the meaning of the ATS. In sum, after gauging Mr. Taveras's parental child abduction claim against the current state of international law, we conclude that Ms. Taveraz's

---

[8] The plaintiff in *Sosa* also relied on a survey of national constitutions, a case from the International Court of Justice, and federal cases.

conduct "violate[d] no norm of customary international law so well defined as to support the creation of a federal remedy." *Id*. at 738.[9]

"[T]he determination of whether a norm is sufficiently definite to support a cause of action [under the ATS] should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." *Id*. at 732-33. The district court found that permitting Mr. Taveras's parental child abduction cause of action to be asserted under the ATS would "turn[] district courts nationwide into ill-suited family courts." *Taveras*, 397 F. Supp. 2d at 915. Although this might be a slight overstatement, we concur in the underlying sentiment. Creating a federal cause of action over parental child abduction where a parent immigrates with her children to the United States, we fear, would open the floodgates to a mass of custody-related disputes by aliens. This would be inappropriate since "parental child abduction," as styled in the case at bar, does not present any *jus cogens* or otherwise binding customary norm of international law which gives rise to a violation of the law of nations under the ATS.

Accordingly, the district court did not err in finding that Mr. Taveras's action did not arise jurisdictionally under the ATS.

### B. *Alternative Basis for Jurisdiction*

In a final attempt to identify a jurisdictional basis over his action, Mr. Taveras argues that the district court has federal question jurisdiction over his claim seeking to enforce the Santo Domingo family court's order to appear because the enforcement of foreign orders implicates comity and, accordingly, involves international law. Specifically, he argues that the trial court had jurisdiction "to determine whether res judicata or collateral estoppel should be given to the [Santo Domingo family court's] order to return the children to the Dominican Republic." (Appellant's Br. at 24). In support of his argument, Mr. Taveras points to two Second Circuit cases and an *American Law Reports* publication, 13 A.L.R. Fed. 208, for the proposition that valid judgments of foreign courts are entitled to enforcement by federal courts when such judgments are not contrary to domestic policy. Mr. Taveras's argument is unconvincing.

Mr. Taveras originally brought his action, *inter alia*, under the Full Faith and Credit Clause, U.S. Const. art. IV § 1.[10] However, it is well-settled that, unlike the recognition and enforcement of judgments due to sister states, a foreign country's judgments are not subject to the Full Faith and Credit Clause. *See Allstate Ins. Co. v. Hague*, 449 U.S. 302, 322 n.4 (1981) (Stevens, J., concurring ("The Full Faith and Credit Clause, of course, was inapplicable . . . because the law of a foreign nation, rather than of a sister State, was at issue[.]"); *Soc'y of Lloyd's v. Reinhart*, 402 F.3d 982, 993 (10th Cir. 2005) (quoting *Allstate Ins. Co.*, 449 U.S. at 322 n.4); *Jaffe v. Accredited Sur. & Cas. Co., Inc.*, 294 F.3d 584, 591 (2002).

Rather, to determine whether a judgment issued by a court of a foreign country is entitled to preclusive effect, the threshold inquiry is whether the case arises under federal question or diversity jurisdiction. 18B Charles Alan Wright, et al., *Federal Practice and Procedure* § 4473 (2d ed. 2002 & Supp. 2004). In federal question cases, "there is no apparent reason to consult state law and federal courts routinely determine the res judicata effects of foreign judgments [pursuant to a

---

[9]Since our decision rests on the conclusion that any prohibition on parental child abduction, as described in the complaint, has not "attained the status of binding customary international law[,]" we need not reach the issue of whether the ATS jurisdictional analysis also necessitates an inquiry into the severity of the charged conduct. *See Sosa*, 542 U.S. at 732, 735.

[10]The district court did not address the Full Faith and Credit Clause argument.

theory of comity] without any reference to state law." *Id.* (citing *Int'l Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324, 1328-30 (Fed. Cir. 2001); *Egan v. Weiss*, 119 F.3d 106 (2d 1997)). "In alienage and diversity jurisdiction, on the other hand, the recent decisions all refer recognition and res judicata questions to the choice-of-law principles used by the state in which the federal court sits." *Id.* (citing *Hilton v. Guyot*, 159 U.S. 113 (1895); *Soc'y of Lloyd's v. Turner*, 303 F.3d 325, 329 n.9 (5th Cir. 2002); *Sw. Livestock & Trucking Co., Inc. v. Ramon*, 169 F.3d 317, 320 (5th Cir. 1999)).[11]

Comity "is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton*, 159 U.S. at 164. "'Comity' is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." *Id.* Moreover, "[c]omity is an affirmative defense" for which the movant holds the burden of proof. *Int'l Transactions, Ltd. v. Embotelladora Agral Regiomontana, SA de CV*, 347 F.3d 589, 594 (5th Cir. 2003).

In arguing that comity brings about federal question jurisdiction, Mr. Taveras puts the proverbial cart before the horse.[12] The assertion or existence of comity concerns, alone, do not create federal question jurisdiction. Rather, when an action already rests on federal question jurisdiction, the theory of comity can serve as a discretionary basis for a court to determine whether a foreign country court's judgment should be given preclusive effect. As courts of limited jurisdiction, federal courts are obligated to consider whether a judgment of a foreign court should be afforded comity only when the federal court already has jurisdiction.

Another obvious flaw in Mr. Taveras's argument is that no foreign *judgment* is implicated in this case. The Santo Domingo family court has only issued *orders* for Ms. Taveraz and the children to return to the Dominican Republic for the purpose of appearing for the reassessment of guardianship proceedings instigated by Mr. Taveras after the children's immigration to the United States. Therefore, we conclude that Mr. Taveras's request that the district court enforce an interlocutory order of a foreign court does not confer subject matter jurisdiction on the district court.

As Mr. Taveras has failed to demonstrate any cognizable basis for federal jurisdiction over his complaint, we hold that the district court did not err is dismissing his action on the grounds that the court lacked subject matter jurisdiction.

## IV. CONCLUSION

For the aforementioned reasons, we **AFFIRM** the district court's dismissal of Mr. Taveras's parental child abduction action for lack of subject matter jurisdiction.

---

[11] We note that diversity jurisdiction in not present in this case because, according to the facts set out in the complaint, the amount in controversy requirement is not met. 28 U.S.C. § 1332(a).

[12] Mr. Taveras points to no case which supports his proposition. Moreover, our research indicates that no court has held or suggested that the mere existence of a foreign judgment, much less an order, supplies a federal court with subject matter jurisdiction.